IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OLIVIA TYLER-BENNETT**, | Case No. 3:16-cv-2300-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UNITED STATES OF AMERICA**, | |
| Defendant. | |

Jane Paulson, PAULSON COLETTI TRIAL ATTORNEYS PC, 1022 NW Marshall, No. 450, Portland, OR 97209; Peter R. Mersereau, MERSEREAU SHANNON, LLP, 111 SW Columbia Street Suite 1100, Portland, OR 97201. Of Attorneys for Plaintiff.

Billy J. Williams, United States Attorney, and Susanne Luse, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

On August 24, 2012, Plaintiff Olivia Tyler-Bennett, then a minor, received medical treatment at La Clinica del Valle Family Health Care Center (La Clinica). Plaintiff alleges that La Clinica negligently failed to diagnose Plaintiff's condition and timely refer her to emergency treatment, causing Plaintiff to suffer additional damage. As explained below, under the Federal Tort Claims Act (FTCA), Plaintiff's exclusive remedy for the medical malpractice allegedly

committed by La Clinica is against the United States. 28 U.S.C. § 2679(b). In addition, the FTCA requires that a tort claim against the United States be brought within two years after the accrual of that claim. 28 U.S.C. § 2401(b). On October 14, 2015, Plaintiff sued La Clinica in state court. The United States intervened, removed the case to federal court, and obtained substitution in place of La Clinica. After the United States moved to dismiss, arguing among other things that Plaintiff had failed to exhaust her administrative remedies and was asserting a claim that was time-barred, the parties stipulated to the dismissal of that lawsuit. On December 12, 2016, after Plaintiff exhausted her administrative remedies, Plaintiff filed a new lawsuit against the United States based on the same operative facts, alleging medical negligence by La Clinica. The United States has moved for summary judgment against Plaintiff's second lawsuit, arguing, among other things, that Plaintiff's claim is barred by the applicable two-year statute of limitations for tort actions. Because Plaintiff's lawsuit was commenced against the United States within two years of the "accrual" of her malpractice claim, the Court denies Defendant's motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

A.  **Statutory Framework Under the FTCA and FSHCAA**

The FTCA waives the United States' sovereign immunity for tort actions and vests federal district courts with exclusive jurisdiction over suits arising from the negligence of government employees. 28 U.S.C. §§ 1346, 2671-80; *see also D.L. by and through Junio v. Vassilev*, 858 F.3d 1242, 1244 (9th Cir. 2017). "Before a plaintiff can file an FTCA action in federal court, however, he must exhaust the administrative remedies for his claim. 28 U.S.C. § 2675(a)." *Id*. "An administrative claim is deemed exhausted once the relevant agency finally denies it in writing, or if the agency fails to make a final disposition of the claim within six months of the claim's filing." *Id*. The FTCA also contains a two-year statute of limitations for tort claims. The FTCA provides, in relevant part:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b) (emphasis added).

The Federally Supported Health Centers Assistance Acts (FSHCAA) of 1992 (Pub. L. 102-501) and 1995 (Pub. L. 104-73) extend the protections of the FTCA to eligible grantees under the Health Center FTCA Medical Malpractice Program (Program), established by the Public Health Service Act under 42 U.S.C. § 254b. 42 U.S.C. § 233(g); *see also D.L.*, 858 F.3d

PAGE 3 – OPINION AND ORDER

at 1244. These grantees include Community Health Centers, Migrant Health Centers, Health Care for the Homeless Health Centers, and Public Housing Primary Care Health Centers. The intent of the Program is to increase the availability of funds to grantee Health Centers by reducing or eliminating their medical malpractice insurance premiums. With more available funds, Health Centers can provide more primary health care services to those in need. La Clinica is an eligible grantee Health Center under the Program. Thus, it is deemed to be a Public Health Service employee under 42 U.S.C. § 233(g)-(n). In addition, all of La Clinica's licensed staff members are deemed to be employees of the Public Health Service for purposes of the medical malpractice coverage and limitations provided by the FTCA.

**B.     Facts**

On August 24, 2012, Plaintiff, who was then 15 years old and suffered from muscular dystrophy, experienced vomiting, diarrhea, a sore throat, and general malaise. ECF 21 at 2, ¶ 6. Three days later, on August 27, 2012, Plaintiff's mother, Hannah Tyler ("Tyler"), took Plaintiff to La Clinica, where she was seen by Dr. Karen Sauer. ECF 21 at 2, ¶ 7-8. La Clinica's health care providers performed a strep test and drew Plaintiff's blood for testing. Dr. Sauer prescribed Zofran, an anti-nausea medication, and told Tyler that Plaintiff should take Zofran for one day, and call the clinic if her vomiting returned.

The next morning, Dr. Sauer (or another health care provider at La Clinica) called Tyler and told her that the results of Plaintiff's blood test had revealed a more serious issue. La Clinica advised Tyler immediately to take her daughter to the emergency room. ECF 21 at 2, ¶ 12; ECF 18-1 at 2. Tyler woke Plaintiff and observed that Plaintiff's condition had seriously worsened overnight. Tyler promptly took Plaintiff to the emergency room at Rogue Valley Regional Medical Center ("Rogue Valley"). ECF 21 at 2, ¶ 13. Shortly after they arrived, Plaintiff collapsed and stopped breathing. *Id.* at ¶ 15; ECF 18-1 at 3-4. Emergency room

personnel performed lifesaving procedures, including intubating Plaintiff and giving her cardiopulmonary resuscitation. ECF 18-1 at 4-5; ECF 21 at 2-3, ¶ 15-16. Plaintiff was admitted to the intensive care unit and remained at Rogue Valley for about a week. ECF 21 at 3, ¶ 17. Plaintiff was intubated at least twice during her stay at Rogue Valley. ECF 21 at 3, ¶ 16.

On September 5, 2012, after a week at Rogue Valley, Plaintiff was transferred to Oregon Health and Sciences University ("OHSU"). Plaintiff remained at OHSU for about six weeks. ECF 21 at 3, ¶ 18. While Plaintiff was being treated at OHSU, Plaintiff and Tyler learned that Plaintiff's illness had been caused by a rare condition called Lemierre's Syndrome. Plaintiff's Lemierre's Syndrome had caused numerous infections and other complications, including pancreatitis and dehydration. ECF 21 at 3, ¶ 20. After about a month into Plaintiff's stay at OHSU, Tyler was also told that Plaintiff had suffered a perforated esophagus, which was likely caused by one of her two intubations at Rogue Valley. The tear in Plaintiff's esophagus caused bile and stomach acid to leak into her chest and lungs, which caused infections and chemical burns throughout Plaintiff's body. ECF 21 at 3, ¶ 21. Plaintiff underwent several surgical procedures while at OHSU, including a surgery to fix the tear in her esophagus. ECF 21 at 3, ¶ 22. Plaintiff was discharged from OHSU on October 17, 2012. Plaintiff remained sick for some time, and suffered injuries to her vocal cords, damage to her lungs, and scarring on her neck, chest, and legs, among other issues. ECF 21 at 3, ¶ 23.

At some point in 2013, Tyler and her sister, Sara Braun ("Braun"), became concerned about two aspects of Plaintiff's treatment at Rogue Valley. First, Tyler and Braun became concerned that doctors at Rogue Valley had perforated Plaintiff's esophagus, causing most of her lasting injuries, and failed to diagnose that perforation. Second, Tyler and Braun questioned whether Rogue Valley should have transferred Plaintiff to OHSU sooner than it did. ECF 21 at 4,

¶ 26-28. While at OHSU, Tyler was told that OHSU originally expected Plaintiff to arrive three days earlier than she did. ECF 21 at 3, ¶ 24. Tyler contends that Plaintiff would have received better care at OHSU, which has a pediatric intensive care unit, than at Rogue Valley, which does not, and thus that an earlier transfer might have improved Plaintiff's overall treatment and condition. ECF 21 at 3-4, ¶ 24, 28.

At some point in 2013, Braun obtained Plaintiff's medical records from Rogue Valley and OHSU. In November 2013, Braun contacted attorney Jane Paulson ("Paulson"), one of Plaintiff's attorneys in this case, to investigate potential medical malpractice claims against Rogue Valley relating to the perforation of Plaintiff's esophagus. ECF 20 at 2, ¶ 2; ECF 21 at 4, ¶ 29. Paulson began to investigate Plaintiff's potential claims and received from Braun some of Plaintiff's medical records and other information. ECF 20 at 2, ¶ 3. In January 2014, Paulson obtained Plaintiff's medical imaging records from OHSU. In April 2014, Paulson began to send Plaintiff's records to medical experts for review. ECF 20 at 2, ¶ 7.

Paulson states that in February 2015, after consulting with an expert in emergency room care, she learned for the first time that Plaintiff had a potential malpractice claim against La Clinica for its decision to release Plaintiff on August 27, 2012, rather than to keep her for observation or immediately refer her to an emergency room. ECF 20 at 2, ¶ 8. In March 2015, Paulson discussed with Tyler Plaintiff's potential negligence claim. *Id.* at ¶ 9. On April 10, 2015, Tyler authorized Paulson to pursue claims against La Clinica and Dr. Sauer, as well as against Rogue Valley. ECF 20 at 2, ¶ 10.

Before filing Plaintiff's lawsuit, Paulson researched La Clinica by doing a public records search, including a review of corporate filings with the Oregon Corporation Commission. ECF 20 at 3, ¶ 11. In conducting these searches, Paulson did not learn that La Clinica is a federal

entity (or, specifically, a Public Health Service entity or employee) under the FTCA. *Id.* at ¶ 13. Plaintiff sued La Clinica and Dr. Sauer in Jackson County Circuit Court on October 14, 2015. ECF 1 at 2, ¶ 5. Also at that time, Paulson believed that Oregon's state law minority tolling provision (which tolls the running of the applicable statutes of limitations for minors) would apply to Plaintiff's claims and, accordingly, that the limitations period on Plaintiff's medical malpractice claims had not expired. ECF 20 at 3, ¶ 12. It was not until after filing Plaintiff's lawsuit that Paulson learned that La Clinica was subject to the FTCA, which does not have a minority tolling provision. ECF 20 at 3, ¶ 13. On November 3, 2015, Paulson filed Plaintiff's required tort claim notice with the U.S. Department of Health and Human Services ("HHS"). ECF 20 at 3, ¶ 14.

Plaintiff alleges that La Clinica and its personnel were negligent in failing to send Plaintiff immediately to the emergency room, failing to hydrate her before sending her home, and failing to ensure that Plaintiff could consume and retain liquids before sending her home. As a result of these failures, Plaintiff contends that her condition worsened to the point of requiring emergency intubation the following day, which in turn caused additional injury to Plaintiff.

## DISCUSSION

Defendant moves for summary judgment on the ground that Plaintiff's claim is barred by the FTCA's two-year statute of limitations. The parties agree that, for purposes of determining whether the statute of limitations has expired, Plaintiff is considered to have filed her claim on October 14, 2015, the date on which Plaintiff filed her initial action in state court. The parties also agree that the FTCA carries a two-year statute of limitations applicable to Plaintiff's tort claim and that, unless the Court equitably tolls the statute of limitations, Plaintiff's claim would be untimely if it *accrued* before October 14, 2013. 28 U.S.C. § 2401(b). The parties dispute when Plaintiff's claim "accrued" against La Clinica and Dr. Sauer, and thus against the United

PAGE 7 – OPINION AND ORDER

States. The parties further dispute whether equitable tolling is appropriate under these circumstances, if the Court were to conclude that Plaintiff's claim is otherwise untimely.

**A.     Whether Plaintiff's Claim Is Time-Barred**

**1.     When a medical malpractice claim accrues under the FTCA**

The time of accrual of an FTCA claim is determined by federal law, not state law. *Erlin v. United States*, 364 F.3d 1127, 1132 (9th Cir. 2004). Further, under the FTCA, unlike the law in many states, accrual does not "await awareness by the plaintiff that his injury was negligently inflicted." *United States v. Kubrick*, 444 U.S. 111, 123 (1979). "[A] medical malpractice claim under the FTCA accrues when the plaintiff discovers *both* the existence *and cause* of his injury." *Augustine v. United States*, 704 F.2d 1074, 1077-78 (9th Cir. 1983) (emphasis added). In a medical malpractice case "based on the failure to diagnose or treat a pre-existing condition . . . the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." *Id.* at 1078 (emphasis in original). "Discovery of the cause of one's injury . . . does not mean knowing who is responsible for it. The 'cause' is known when the immediate physical *cause* of the injury is discovered." *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984) (emphasis added); *see also Davis v. United States*, 642 F.2d 328 (9th Cir. 1981) (plaintiff was aware of immediate physical cause of injury when he became aware that a vaccine he received was the likely cause of his injury).

In a case alleging medical malpractice by failure to diagnose, which is the claim alleged by Plaintiff based on her experience at La Clinica, discovering the *cause* of one's injury may be more difficult. As explained by the Ninth Circuit:

> When a physician's failure to diagnose, treat, or warn a patient results in the development of a more serious medical problem than that which previously existed, identification of both the injury and its cause *may be more difficult for a patient than if affirmative conduct by a doctor inflicts a new injury*. Where a claim of

> medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment. *In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b).*

*Augustine*, 704 F.2d at 1078 (emphasis added).

### 2. Analysis

The day after Plaintiff visited La Clinica, someone from La Clinica called Tyler to say that some issues had come up with Plaintiff's blood test—in other words, that she was more sick than they initially realized. They advised Tyler to take Plaintiff to the emergency room. Upon awaking Plaintiff, Tyler noticed that Plaintiff's condition had deteriorated overnight. In fact, Plaintiff's condition had deteriorated so much in that time that, shortly after arriving at the emergency room at Rogue Valley, Plaintiff collapsed, stopped breathing, and had to be resuscitated and intubated. In October 2012, Tyler learned of Plaintiff's torn esophagus and related injuries, caused by Rogue Valley's personnel performing one or both of the two intubations received while Plaintiff was at Rogue Valley.[1]

As alleged against La Clinica (and, thus, against the United States), Plaintiff asserts that had La Clinica performed further tests or treatment on Plaintiff or referred Plaintiff to an emergency room on the day she visited La Clinica, Plaintiff might have avoided needing the

---

[1] Plaintiff was intubated at least twice while at Rogue Valley. Tyler recalls that the second intubation was done shortly after doctors removed the first tube, because Plaintiff still could not breathe on her own. ECF 18-1 at 7-8.

lifesaving care that resulted in her esophagus being punctured while at Rogue Valley. Thus, Plaintiff's "injury," for purposes of her claims against La Clinica, was the worsening of her condition to the point that she required resuscitation and intubation while at Rogue Valley.

Plaintiff's attorney, Jane Paulson, explains, however, that it was not until 2015, after consulting with an emergency room expert, that she learned for the first time that Plaintiff had a "potentially viable medical malpractice claim against" La Clinica. Plaintiff's mother, Tyler, states that she was "not aware of facts giving rise to a malpractice claim" against La Clinica before March 2015. The only new fact, however, that came to light in March 2015, was that Plaintiff's attorney learned from an emergency room expert that perhaps a more timely diagnosis and immediate referral by La Clinica to emergency room treatment on August 24, 2012 might have prevented the worsening of Plaintiff's condition, which in turn might have avoided the need for intubation, which in turn would have avoided the puncturing of Plaintiff's esophagus during one or both of the intubations.

The United States argues that Plaintiff's claims against La Clinica accrued when Plaintiff and her mother learned that one or both of her two intubations at Rogue Valley caused her lasting injuries. At that point, Plaintiff and her mother knew that Plaintiff's condition had deteriorated and resulted in injury. The Court agrees that Plaintiff became aware of her *injury*, for purposes of the pending lawsuit, when Plaintiff and her mother learned in October 2012 that Rogue Valley's medical personnel punctured Plaintiff's esophagus on August 25, 2012. That does not, however, answer the second part of the question: when did Plaintiff (and her mother) learn that La Clinica *caused* that injury, in the sense of causing the need for intubation at Rogue Valley (or could have prevented that need with earlier diagnosis and referral to emergency services).

The United States argues that this case contains facts similar to those presented in *Fernandez v. United States*, 673 F.2d 269, 272 (9th Cir. 1982). In *Fernandez*, a child, Mark, developed jaundice shortly after his birth. Upon his discharge from the hospital in May 1958, Mark's parents received Mark's medical records, which contained all the relevant facts about his diagnosis and treatment. In October 1964, Mark's mother filled out a school application for Mark, in which she stated that Mark had deafness caused by jaundice. In 1976, Mark brought a medical malpractice claim, alleging that his jaundice was discovered too late, a blood test was done too late, and a blood transfusion was performed too late. The district court concluded that because Mark's parents knew about his jaundice and its connection to his disabilities at least as early as 1964, Mark's claims were untimely. The Ninth Circuit agreed:

> Mark (through his parents) was aware of his injury and its probable cause. They not only knew of the injury, and that it was caused by the jaundice, they also knew, or would have known if they had read the discharge summary, or asked the Kaiser doctors about it, that the jaundice (the "cause") had been treated, and exactly when and how it had been treated. If they had inquired, and if there were merit in the case, presumably they would have learned that there was a possibility that the diagnosis and treatment came too late, and that earlier diagnosis and treatment would (or might) have prevented the sad after-effects of the jaundice. It is this possibility which is the sole ground upon which Mark claims that there was malpractice.

*Fernandez*, 673 F.2d at 271. The court "decline[d] to defer accrual of the claim until fault, as distinguished from injury and cause, [wa]s determined." *Id.*

The United States argues that Plaintiff (and her mother) knew that Plaintiff's Lemierre's disease and other conditions such as dehydration had caused Plaintiff to require intubation at Rogue Valley, which in turn caused significant additional injury. Plaintiff and her mother observed much of Plaintiff's treatment at La Clinica and, according to the United States, either knew—or could have asked—about how her ailments were treated. If Plaintiff and her mother

PAGE 11 – OPINION AND ORDER

had inquired, argues the United States, they might have learned that an earlier diagnosis, or earlier treatment, might have prevented Plaintiff's condition from worsening.

Plaintiff, however, maintains that the facts in the pending lawsuit are closer to the facts presented in *Drazan v. United States*, 762 F.2d 56 (7th Cir. 1985). In that case, the plaintiff's husband, Drazan, received annual check-ups at a Veterans Administration ("VA") hospital to monitor his tuberculosis, which was in remission. In November 1979, an x-ray revealed a possible tumor, and a radiologist suggested that Drazan be given a follow-up exam, but no follow-up was ever conducted. When Drazan returned for his next routine chest x-ray in January 1981, his tumor had grown, and he died the following month. In November 1981, Drazan's wife requested her husband's VA treatment records and discovered the results of the November 1979 exam and the VA's failure to follow up.

The Seventh Circuit held that the statute of limitations "begins to run either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first." *Id*. As Judge Posner explained, "[l]ung cancer did kill [Drazan], but maybe only because the government failed to follow up on the results of an x-ray examination. When there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause." *Id*. at 58-59. The court found no evidence in the record that when the plaintiff's husband died, she had any reason to suspect a governmental cause to her husband's death. *Id*. at 58. Absent an understanding of why the plaintiff had requested her husband's medical records in the first place—and whether doing so was driven in part by a suspicion that there had been negligence—the court could not conclude that the plaintiff's claim was timely,

and remanded to the district court. *Id*. at 59-60. Plaintiff argues that, as in *Drazan*, one possible cause of Plaintiff's injury was her overnight deterioration, while another possible cause was La Clinica's failure adequately to treat her—or immediately refer her to emergency room services.

Plaintiff also relies on *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986), and *Rosales v. United States*, 824 F.2d 799 (9th Cir. 1987). *Simmons* involved a sexual relationship between a psychologist and a patient, which caused the patient emotional distress. Although the plaintiff in *Simmons* knew of the existence of the relationship at the time it occurred, it was not until several years after the end of the relationship that the plaintiff learned that the inappropriate relationship *caused* her emotional distress and sued. *Simmons*, 805 F.2d at 136. On this theory, the Ninth Circuit held that the plaintiff's claims were timely because "[i]t was not knowledge of [the psychologist's] *legal fault* that [the plaintiff] gained in 1983, but knowledge of the *fact that his mishandling of [of the relationship] had caused* her psychological damage." *Simmons*, 805 F.2d at 1367 (emphasis in original).

In *Rosales*, a woman became pregnant while having an intrauterine device ("IUD"), and a physician at a U.S. Marine Corps installation told Rosales that having an IUD posed some unspecified risks. Rosales then delivered a baby born prematurely and with a "lazy lid." Rosales, however, was repeatedly told that her baby was healthy. Sometime later, Rosales learned that her baby had "nonprogressive encephalopathy" that might have been caused by "intrauterine infection." Later, a scan revealed "permanent mental retardation." It was not until about a year after all of this that a different physician told Rosales the baby's condition could have been caused by her IUD. The district court dismissed the action, concluding that the statute of limitations had run. The Ninth Circuit, however, reversed. The Ninth Circuit held that the FTCA medical malpractice claims on behalf of the child (and the parents' own claims) did not accrue at

the time of the child's birth. According to the Ninth Circuit, "[o]rdinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so." *Rosales*, 824 F.2d at 805.

Plaintiff argues that, like the plaintiffs in *Simmons* and *Rosales*, she had no reason to know the *cause* of her injury until a medical expert explained to her the mechanism of that injury. The Court concludes that there is a genuine dispute of material fact with respect to whether Plaintiff knew, or in the exercise of reasonable care, should have known, that La Clinica may have caused Plaintiff's need for intubation, or failed to prevent it from occurring. Summary judgment, therefore, is inapproporiate. In light of this ruling, the Court declines to address Plaintiff's alternative argument based on equitable tolling.

## CONCLUSION

Defendant's motion for summary judgment (ECF 18) is DENIED. The parties shall contact the Courtroom Deputy to schedule a date for trial to the Court.

**IT IS SO ORDERED**.

DATED this 27th day of June, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge